May it please the Court, there are several issues to address here. I'd like to start with the Article 3 standing issue. No class member here suffered any Article 3 harm from Experian identifying the source of the information at issue here with the name Advanta rather than the name Cardworks. I'd like to explain why that's clear, specifically with reference to the Spokio case in the Supreme Court and also this Court's opinion more recently in Beck v. McDonald. And the key to all of this is that the record makes clear that this identification of the source as Advanta rather than Cardworks had no real-world effect on anybody, any class member, either the absent class members or Mr. Dreher. As Judge Gibney recognized, anything or anyone using the contact information that Experian provided would have reached Cardworks. Mr. Dreher himself reached Cardworks that way. And there's, of course, no showing that any of the remaining class members even attempted. Could Experian have used both names, Cardworks and Advanta? Could they have? Yes. Why didn't they? Your Honor, I don't think that the record is 100% clear on what factors go into. I think there are some instances, although not usually, that two names will be used. But basically, they were advised by the FDIC. Why the FDIC? Because the FDIC was responsible for running Advanta Bank or what was left of it after it went into trusteeship. The FDIC was the receiver, wasn't it? Yes. They were the bank. They were everything. What's the receiver? Yes. I mean, the receivables were still owned by different entities. Right. The receiver is like the trustee or something. Yeah. They're in charge. Sorry, Your Honor? The receiver is in charge. That's my understanding, Your Honor. I should add that, you know, this – But the statute talks about the FTC. Some statute does. The Federal Trade Commission. If you understand all these acronyms or know what they are, you'd know there's a Federal Trade Commission and a Federal Deposit Insurance Corporation and that they're two different things, but they're both somewhere within the federal government. Yes. And, I mean, just to be clear, the FTC is responsible for administering the Fair Credit Reporting Act, but they're not consulted with on a regular basis to get – it's not like the IRS where you get advisory opinions. What's their relationship to the receiver when the FDIC gets in it? Well, the FDIC was just in charge of – they basically are consulting with them as they would consult with a customer. The FDIC steps in and takes over banks that go under. Yes. That's how it becomes a receiver. Exactly. Under the banking law. Yes. And – but with the court's permission – The credit law talks about the Federal Trade Commission. Right. But they're two – but they're all within the federal government. They are. And the one that approved you all, or you say approved you, what you did, is the FDIC. Yes. Not the FTC. Correct. And, you know, we're not claiming that that was binding regulatory guidance or anything like that, but – You're not claiming that the FDIC was binding regulatory guidance? On this issue, correct. But it might be some indication of experience, good faith, and lack of willfulness. Well, certainly, Your Honor. And that, I think, is really – I thought the term was used of reasonableness. Had that done reasonably? Well, it's actually – it's a special use of the word reasonableness. The standard for willfulness is – for this type of liability is willfulness, which actually – Right. But you all are arguing that it's sort of like a qualified immunity standard or something. We are on the merits. Which means you have to act unreasonably, doesn't it? It means you have to act unreasonably in a specialized meaning, which means you've got to violate clearly established law. It's got to be clear that what you're doing is unlawful. So that goes beyond just acting reasonably. You've got to be acting in violation of a clearly established legal requirement. Is it your position, then, that if the FDIC put its stamp of approval on it, that undermines any contention that you acted unreasonably? I think it undermines any contention that we acted with willfulness. I think that the question of reasonableness under SAFECO is something that just looks at the statute. Let me take a step back. There's a two-step determination under SAFECO. The first step is basically a safe harbor or a threshold test, and that's just without looking at the reasons why the company did something or the defendant did something. You just look at did the plaintiff have to show they violated something or allegedly violated a clearly established legal requirement. If it was not clearly established in the sense that SAFECO describes, the defendant gets summary judgment. There's then a second step that you're supposed to go to if the defendant doesn't get summary judgment where the Supreme Court says the standard is recklessness, and that's something that the district court would think erroneously inflated with the first question but actually is something that's more of a state of mind determination that goes to the jury. None of this, though, I just want to be clear, goes to the question of standing, which I think- We got away from standing. We got ahead of you there, didn't we? Well, you know, I want to go where you want to go, Your Honor, so, you know- I actually do want to hear about standing in Spokio and Beck. Yes, so- I think I got you away from that. So on that Spokio issue, what I was starting to say was that there was no showing there was any real-world effect on anybody. Experian gave this name, the contact information, people who wanted to contact the source were able to contact them. So looking at Spokio, Spokio, which was decided, I should add, after Judge Gibney's decision here, Spokio gives two examples of FCRA violations that are violations but do not rise to the level of Article III standing, that don't amount to concrete harm because they have no practical or real-world effect. And I think both examples actually fit here. The first example is a procedural violation that doesn't end up resulting in an inaccuracy. And the example the Court gives is a disclosure requirement that's not met, but where the consumer doesn't end up as a result having any inaccuracy on their credit report. That is directly applicable here because the source requirement that we have here, the sole purpose of the source requirement, and you can look at the plaintiff's brief for that, they describe the purpose of the source requirement. It is to prevent inaccuracies by giving consumers a chance to contact the source and challenge any information they think is wrong on their report. In this case, identifying the source with the name Advanta, as opposed to the name Cardworks, did not result in any inaccuracies or prevent anybody from contacting the source to correct any inaccuracy. There was no real-world effect. There hasn't been even any effort to show that there was any real-world effect. Judge Gibney thought before Spokio that just the fact of the violation was enough to constitute concrete harm, but under Spokio it's not, and this fits, as I said, within precisely this example. It's a procedural protection to prevent inaccuracy, but where there is no inaccuracy, there's no concrete harm, there's no standing. The second example that they give is an inaccurate zip code, and the inaccurate zip code is basically that even if there is an inaccuracy, but it's an insignificant inaccuracy that has no practical effect, that that is not concrete harm for Article III. Here we've got a 69,000-member class with no showing of any inaccuracies for them at all, not even an insignificant inaccuracy, so it's almost a fortiori of the zip code example where you at least have an insignificant inaccuracy. If I can turn. I have a question. Would it be a violation to provide standing if Experian used an abbreviation for a credit card company? Well, that's a good question, Your Honor. I don't think it would, and I think that helps to, I mean, No, Dad, I'm planning to argue it's a violation. Wait. I know, but I thought you might want to analogize that for me and tell me why that would be no harm. You know, in other words, at one point, American telegraph and telephone, everybody knew it was that. Then it got to be AT&T, but I'm just saying what if they took Advanta and did ADV hyphen NTA, you know, because the IT person said we only have so many spaces and we can't use the full name. So if Experian came up with their own understandable but unique, say, abbreviation, which is just an apostrophe to indicate a letter had been admitted, is a harm here any more than that harm? No, it's exactly the same, Your Honor. And what Spokio says is that you've got to have more than something that you can argue is a technical violation of the statute. It has to matter. It can't be just that sort of example or this example where the choice of the name does not actually interfere with the class members in any way, with the consumers in any way. I want to ask one question about the FDIC. While it's true that the FDIC, I don't know if you can quite understand me. I hope you can. I'm not sure. The FDIC, in my understanding, is not in the same position, say, as a private individual appointed to be the receiver or to be the trustee. My experience and understanding has been that the FDIC is also charged with a governmental interest of maximizing and protecting, maximizing asset return or support or stabilization to protect a class of governmental, government-funded program. In other words, I know the FDIC is paid by members' fees, but that's a government program, and the FDIC has more than just a typical receivership interest. They also have the interest of protecting the federal FISC. Isn't that correct? That is correct, Your Honor. So even though the FDIC may not give absolute clear guidance, shouldn't that count for something because their role is more than just a private receiver? Exactly right, Your Honor. And what happened here is that because the district court jumped ahead basically to grant summary judgment as a matter of law and willfulness, the Sixperian never even got the opportunity to put that before a jury to argue that it was not acting recklessly toward its statutory obligations in making this decision. And one important piece of evidence of that is that it's consulting with this governmental entity, which even though it's not the FTC, is still a governmental entity. I know, but back to that point. But if there's injury in fact because it just says ADVANTA and no slash Cardwell Services, weren't you directed to do that on? It was suggested you do that by a government agency that has, as part of this mission, protecting the federal FISC? Yes, 100%. Isn't that a standing argument too, though, not just a willfulness argument? It's a little hard for me to answer that because I don't know that Spokio answered all of those questions. But I'm asking what you think about it in light of the current law. Yeah. It's – I would say that in light of the current law, I don't think that that would necessarily – I don't think I could argue that that would go to whether the plaintiffs have suffered any injury. I think it goes more to the justification for the conduct. But – Would plaintiffs have suffered any injury if the FTC had directed you to handle it that way? I think that they – as long as they have a colorable allegation that it was nonetheless unlawful for us to do it despite the FDIC, I suppose that – I said – no, no, I said FTC. Oh, the FTC. I changed my question. Okay, I'm sorry. The point is – I see where you're at. No, I want to isolate this. If the government had directed you to do this, if the FTC had directed you to list it the way you did, would that go to standing or would that go to injury in fact, unreasonable conduct? I mean, it would certainly go to the latter one, unreasonable conduct. I know that, but I'm asking about the first. Right. And it might go to that if you could argue that the – because this was basically established as lawful, there's nothing injurious in following it. So in that sense, there would be no injury. Thank you. Okay. Thank you very much. You've received some – Thank you, Your Honor.  Good morning, Your Honors, and may it please the Court. Yes, sir. I would like to go wherever the Court wants to go. I'd like to talk about standing and then willfulness. But first, because several members of the panel have asked about the FDIC's role, I'd just like to clear up a few points. The information at issue here was not reported until after the FDIC was out of the picture. It was no longer the receiver. The bank was transferred to Deutsche Bank, and they are the ones who hired Cardworks. And Judge Gibney looked carefully at Experian's argument that somehow the FDIC had given them permission to omit the relevant source information in the credit reporting, and he rejected that argument. He looked carefully at the evidence Experian provided, which was an e-mail and a letter. And what he found was there was nothing in there about credit reporting obligations. You're talking about the letter that's on page 349? Yes, Your Honor. The letter that's on page 349, and there was also an e-mail. That's what everybody signed up, right there. Cardworks. That's right. But there is nothing in the letter about Experian's credit reporting obligations, nor would it make any sense for the FDIC to take a position on that question, because as you said, the relevant regulatory authority for FCRA compliance is the Federal Trade Commission. And the FDIC wasn't purporting to act in a regulatory capacity here. You had a lawyer, Mr. Wineland, who was acting as the receiver, sitting essentially in the shoes of a bank executive. And nothing he did is unreasonable. I mean, there's nothing unreasonable about communicating with consumers who are ADVANTA consumers using the ADVANTA name. The question here is compliance with the Fair Credit Reporting Act. And the Fair Credit Reporting Act is clear. The statute requires Experian to clearly and accurately disclose to the consumer all information in the consumer's file at the time of the reporting, including the sources of information. And Experian itself, internally, as a matter of its own policies. So what is the injury? The injury, as a matter of Article III standing, I'm happy to talk about what the case law is, but the real-world injury, Mr. Dreher's case, shows you how this affected him. I mean, his top-secret clearance was at stake. It took him a year to clear this up. He actually had to file a lawsuit and seek discovery in order to even find out who the source was, that it was Cardworks. And that's important because the Fair Credit Reporting Act places obligations on furnishers. Furnishers, and that's a defined term, 16 CFR 660.2C, defines a furnisher as the entity that furnishes the information. And there's a section of the statute, 1681S2, that provides a whole set of obligations that furnishers have to do. They have to update information. They have to respond to investigation requests. And Mr. Dreher wanted to avail himself of those rights, but he didn't even know who the entity in question was that was the relevant furnisher. So he filed a lawsuit against Experian. He found out that it was Cardworks in discovery and then amended the complaint to add Cardworks and to try to vindicate those obligations. That is not how this scheme is supposed to work. This is a statutory scheme that's all about transparency and accuracy. And if you look at the plaintiff's expert report, they had never seen something like this. They had never seen a situation in which the actual entity that reported the information deliberately omitted itself, and where the credit reporting agency acceded to that request. Judge Gibney also looked at the standard industry protocol, and he saw that the standard industry protocol, as Judge Thacker, as you pointed out, it enables you to indicate both the original creditor and the furnisher or source that is actually reporting the information. That is what's typically done. And so the question here is not was it okay to put IDVANTA on the report. Of course, that's fine. The question was, was it okay for Experian to accede to the request from the furnisher to become invisible? And that is not okay because the furnisher has obligations under the Fair Credit Reporting Act, and the furnisher also is going to be concerned about the furnisher's goodwill if consumers have that information available to them. So you have to look at, I think, the disclosure requirements in tandem with those furnisher obligations to understand why Judge Gibney was correct that this was a blatant violation of the statute. You can have, I think, semantic debates about what a source might mean. There can be real questions, I think, that would be hard questions. But the reason the district court was right in saying this is not a close question, that this was a blatant violation of the Act, is if anyone is the source, it is the entity that's providing the information. Now, I do want to talk about Article III standing. Let me ask you this, though. What did your client, the lead plaintiff in the class or whoever, what did his report show? What information did it show? ADVANTA bank, ADVANTA credit card? I'm going to ask you a follow-up question. What did it show? It showed the name ADVANTA. It flipped between ADVANTA banks and ADVANTA credit cards. And it showed a P.O. box. And that's it. There was no telephone number. Mr. Dreher wrote to the P.O. box, to ADVANTA. He asked for the information. He received no response. He had to write again. When he received a letter, the letter was from ADVANTA, and he did not know that he was dealing with this company, Cardworks. And this is not an unsophisticated consumer, Your Honor. This is someone who has a secret clearance. No, wait. Let me follow up. I thought the record indicated that if you called whatever this entity was, you would get Cardworks. Is that not correct? No, Your Honor. Cardworks deliberately made itself invisible to the public. No, no, no. I'm just asking you. I'm not asking you for argument on this point. It's just a factual question. I thought that I had read in the record that if you contacted the entity on the report, that you would get to Cardworks and be able to get the information you needed. Is that not correct? That's what Mr. Dreher tried to do. He tried repeatedly to clear up this inaccuracy on his credit report. He did not even find out that Cardworks was the entity he was dealing with until discovery after he filed the lawsuit. I still think you answered Judge Shedd's question. It doesn't the record reflect if you called that number, not what Mr. Dreher did right in the appeal box, but doesn't the record reflect if you called that number, you would get? Which number, Your Honor? There was no number on the credit report, so that was part of the problem. Okay, so there's nothing like that in the record. There was no telephone number on the credit report. What Judge Shedd asked you about, there's nothing like that in the record. What the record shows, let me try to be clear. What the record shows was an appeal box, and it was listed as Advanta. And he communicated with what he thought was Advanta by writing a letter. And it's true that that address was associated with Cardworks, but he did not learn that until after he filed the lawsuit. And Cardworks did eventually clear up this inaccuracy in his report, but only after they were sued as Cardworks. Did Cardworks use the same phone number and website as Advanta? It used the Advanta website. That's right. Okay, so yes. And did it use the same phone number as Advanta? Yeah, it acquired that phone number. So yes. So the answer to Judge Shedd's question is yes. Well, no. I mean, I think the point is the statute places a value on knowing who it is you're dealing with, because if you can hide who you are, you're not concerned about consumer goodwill. There's no record that the Federal Trade Commission is going to have about complaints dealing with Cardworks because consumers don't know that they're even dealing with Cardworks. Let me say, I think you're too interested in making your argument without us understanding the facts. I'm sorry about that. On which you can make your argument. We're not saying that's not a valid argument that you can make. Right. But the point is, if I understand it now, after Judge Thacker was kind enough to help me make the point, I do appreciate that. But then he could have used his credit card and called the number on the credit card and gotten the information. Well, he didn't have any credit card. I mean, that was part of the problem. He never opened an account with this entity. He was a victim of identity theft. Now, what he could have done is Googled, and this is addressed in the plaintiff's expert report. If he had Googled, he would have found out that Advanta was this bank that had been closed. He could have gotten the website, and then, you know, as Judge Thacker is pointing out, there was a telephone number at that website associated with this company. Advanta website. Right, exactly. But the company is deliberately hiding itself. It's not giving you the name of an employee on these letters, and that matters because it frustrates the consumers. Are the class members victims of identity theft? No, they aren't, Your Honor. All of the class members suffered the same informational injury, and I think your question is getting to Article III standing, right? Well, it's because when I asked you what the injury was, you started talking about Mr. Dreyer's particular injury and identity theft, and it all sounds very individualized to me. Well, right. I mean, as a matter of law, the injury here is not individualized. So let me isolate what I think is the relevant language in the Spokio opinion. When the court is talking about informational injury, it says, this is a quote, a plaintiff in such a case need not allege any additional harm beyond the one that Congress has identified. And then the court cites two cases, Aikens and Public Citizen. Aikens, and this is the parenthetical in the Supreme Court's Spokio opinion, quote, inability to obtain information, and in Public Citizen, quote, failure to obtain information subject to a disclosure under the statute. In Public Citizen versus Department of Justice, the court was talking about disclosures required by the Federal Advisory Committee Act, and it analogized that to the Freedom of Information Act. And what it said is, our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than they sought and were denied the records. And there's no reason for a different rule here. In FEC versus Aikens, the court reaffirmed that rule. It cited to Public Citizen, and it said, this court has previously held that a plaintiff suffers an injury in fact when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute. See Public Citizen. So in Spokio, the Supreme Court was reaffirming a very specific line of cases where Congress has made a decision that the injury is the denial of certain information that Congress deems important. And that is sufficient for Article III standing. I think the reason I'm talking about Mr. Dreher is that my colleague, Mr. Fader, has suggested that there are no real world harms. The whole reason that Congress enacts a disclosure regime is it's concerned not just about the denial of information. The reason it makes that a right that's vindicable in court is because denial of that kind of information can have all sorts of harms. And in the Fair Credit Reporting Act context, I mean, this stuff is important. If there's anything that's at the core of the Fair Credit Reporting Act, it's that you have a right to all the information that they've got about you in their file. And Congress singled out this specific piece of information, the source. And so this is not some hyper-technical thing where, you know, they say that this is about the business name versus the formal legal name. No. It's about knowing who it is that you're dealing with and who it is that you have rights against which you can assert. You should not have to file a lawsuit against the Consumer Reporting Agency and take discovery to find out who it is that's the furnisher that you have rights against. And that is what had to happen here. And I think it illustrates the importance of the right that Congress created when it allowed plaintiffs to sue for this kind of informational injury. Now, the question, so that's, I think, how to analyze the Spokio question. I think it's black-letter law. And no court before or after Spokio has held that there is not informational injury in circumstances like this where there's a disclosure requirement. So then you've got the Safeco issue, the willfulness question. And I think they're the question to ask where sort of you can break it down into two questions when you're writing the opinion. First, let's... I'm going to ask one question, sorry, back to informational injury. What's the minimum you need for that, in your opinion? What's the minimum you need? You need to be able to identify a right to information. It has to be clear that Congress said that you are the kind of plaintiff who can sue, that you're within the zone of interest, that it's particularized... No, I got that. No, no. I'm just asking what information here. What's the minimum informational error that would support informational standing? Well, I think there are going to be different kinds of cases. This is the easy kind of case where Congress... No, no, no. I asked you what your opinion is of minimal error. I see. Yes. Right. So when Congress says you have to disclose the source... I didn't ask you that. I'm asking you to tell me what is the... I mean, your understanding to help me, what is the minimal informational error that provides for informational standing? In the context of this case? At a minimum. Of any possible case. At a minimum. When Congress requires the disclosure of a specific thing, here's the source, and the defendant fails to provide that information at all, that is a minimal informational injury. Now, you can ask... No, no, no. No, no. I asked what's the minimum information that would be lacking? That would be the name of the furnisher? Yes. That would be the minimum? Yes. Minimal violation? Yes. The name of the furnisher. Exactly. In other words, if you got the name, but you got it wrong, you know, you misspelled it. Right. Would that be an error? No, I mean, yes. Your colloquy with my colleague earlier, I mean, I think that would be a much tougher case. I think it might implicate the zip code hypothetical in the Spokio opinion, and I'm not even sure that would be a violation of the statute. Let me say this, but take away Spokio, why wouldn't that fall under your argument you're making right now? Because here... That any informational error could support a claim of informational standing. Well, yeah, I mean, I think the better way to analyze that, because what the court said in these cases, in FEC versus Aikens and Public Citizen, is that when the plaintiff has alleged that they've suffered an injury that consists in an inability to obtain information that, on their view of the law, they're required to, then they get to come into court and make that claim. They're going to lose if they don't actually have that right under the statute. But as far as the Constitution is concerned... But that would allow for a claim if somebody could make an argument that they misspelled the word. That would give them standing under that argument. I don't think so. I mean, I think... Well, you might not think so, but I guarantee you there are lawyers who would think so, based on your general premise you just gave. Yeah, I mean... And I'm not saying they would be wrong either. I'm not saying they would be wrong. Well, I think there can be, there are going to be cases where the constitutional inquiry and the statutory inquiry kind of merge, and where, you know, you have a truly sort of trivial claim. The question is, is there kind of a de minimis exception to Article III standing? And I think that's, in candor, I do think that's what the Supreme Court is possibly suggesting in Spokio with the zip code hypothetical. But this isn't that case, because they completely omitted the source, the furnisher. They just didn't give the name at all, and they deliberately omitted it. But they said they did it with approval of the FDIC. Right, and that's just not the case. I mean, Judge Gibney looked at this very carefully. The FDIC did not give them any guidance on fair credit reporting, nor did they have any authority or jurisdiction... Well, the FDIC approved what they did. They signed off on it right here. No, but by that letter on page 349. No, but that letter, Judge Gibney, I think, analyzed this correctly. That letter doesn't say anything about... Agreed with your position. I'll agree with that. But why isn't he wrong if the FDIC approved it? Maybe the FDIC was wrong. No, but they didn't. But they're still the government. Well, yes, but... They didn't just approve it. They used language like, we would like for the report on the consumer's trade line to be card services. We would like the new code to report as... No, I mean... They say we in that letter. We'd be in card works, Advanta, and the receiver. Right, but that was not guidance about Fair Credit Reporting Act compliance. I mean, they didn't say, here's our view of that statutory provision. Here's how to comply. They just didn't do that at all. But going back to my question or my point to Appellant's Counsel, that would be some evidence of good faith or at least lack of willfulness, wouldn't it? I think if it were true that a regulatory agency with authority said, do it this way, that would certainly be... No, even this letter. I agree with you that they didn't direct them to do it this way. But this letter, where they agreed and signed off on doing it this way, is surely some evidence of good faith on the part of Experian, isn't it? No, I don't think so. I mean, it's certainly relevant evidence. I'm not disagreeing with you about that. Okay, so then it is some evidence, and it's relevant. And the judge considered it, and then the question is... Did we give any deference to Judge Gibney's direction? I think so, yes. I think we did. Yes, the district judge was very familiar with the record. I mean, obviously, look, this is a summary judgment ruling. It's a de novo review. I don't think we review it de novo. Yes, you do review it de novo. But we don't give any deference. Well, I think only in the sense... I have all respect to the rule of Judge Gibney. Only in the sense, Your Honor, I just... It's de novo review. It is de novo review. Only in the sense that the judge carefully analyzed this evidence in light of the whole record with which he was very familiar. And this is really a post hoc rationalization. There was no communication from the FDIC to Experian about its fair credit reporting obligations. It was only afterwards that Mr. Wineland was hired as a private consultant by Experian. I say it's a post hoc rationalization. They can say you're the Monday morning quarterback, I do. Same kind of thing, right? Yes, no, I think so. But I think ultimately it's Experian that has to undertake its own fair credit reporting obligations. And when no agency has told you we're looking at that particular statutory obligation and we free you from that obligation, then the district court... the correct role is to analyze was this objectively unreasonable and did the company run an unjustifiably high risk of violating the statute. There is no case law... Do you think Experian's case is strengthened by this letter or do you think it's the same as if this letter never existed? I think it is the same as if it never existed because the district judge... You said earlier the letter was worth something. That it would be evidence. It's relevant to take it into account because if their portrayal of it were correct... It's worth something if it's relevant to take into account. But I think it does not help them. The district judge was right that it does not help them. Does it help you? No, it doesn't help us. It's just not what they say it is. Evidence must help somebody. No, I mean it's just not... It ultimately washes out because it is not an instruction about fair credit reporting act obligations. But they're not the Federal Trade Commission anyway. That's right, exactly. It's another branch of government but here they have a position. They're called the receiver. That's right. And they have a title. That's right. An official title. Well, it's important to understand that the receiver... They're not acting in a regulatory... The FDIC does. I mean it sounds like it's before all kinds of authority. It is not acting in a regulatory capacity nor did it... There's a factor in this country. What about the FDIC? I think it's a big deal. Yeah, I mean it's just not acting in a regulatory capacity nor did it have that authority nor did it even purport to say anything about the FCRA and nor did it communicate that to Experian before Experian reported this information. But they do say we would like for this new code to report the customer's trade line as a Vanta credit card. They say that. The FDIC says that. No, I mean that was not... They do say that. Right there in the letter and it's signed off on, on the 4th of October, 2010, as receiver. Yeah, I mean the letter was sent from Cardworks to Experian, not from the FDIC to Experian. The FDIC signed off on it. They signed off on it but not in any regulatory capacity. I mean I just think that's a very thin read. Whatever they do, they do as the receiver. Right. It's an official, everything the FDIC does is official. It's a pretty thin read to rely on when it's such a blatant violation of the statute. It might be a thin read. Maybe it's weak evidence. Yes. But it's evidence. What we have to decide is what it means, if anything. Right. And how much it means, if anything. That's right, Your Honor. And I hope that, you know, when the court thinks about this, it thinks about it in the totality of the circumstances. You have no decisions that support this view of the law that you can omit the source, which is the furnisher, which has obligations under the statute. All of the cases support us. Admittedly, there are not a lot of them. But I think that's because, as Judge Gibney recognized, nobody has had the temerity to argue before that the actual entity that supplies the information is not a source under the Act. Everyone has taken that as obvious for the last several decades that this Act has been in effect. And so we need to get past your standing problem. That's right. That's right, Your Honor. But if we get past your standing problem, then we have to deal with this. That's correct. If we get past this, then we've got to deal with your – we wouldn't get the willfulness if we ruled against you on this. Rule 40 on this, then we've got to decide whether they're entitled to a trial, right? I'm sorry? Go ahead. I'm sorry. No, no. I'm musing. I think the sequencing works like this. First you ask, is there Article III standing? I think that's black-letter law that Spokio reaffirms, and no circuit has deviated from it. I think then you ask, did the district court apply the correct legal standard under Safeco for willfulness? And the answer is yes, because the district court asked both, was this reading objectively unreasonable? And then, did the company run an unjustifiably high risk of harm? And the district court looked carefully at all of the evidence. This was a hard-fought case. This has been going on now for seven years, and it's finally at a conclusion. And the district court, it's true that the review is de novo, but I think the district court got it right. It understood that this was essentially a post hoc rationalization and not really a true undertaking of legal responsibility. It's very different from Safeco, where those companies had a tough statutory question that could go either way. They hired lawyers. They got a legal opinion, and they relied on it. That is good faith. This is not good faith. This is, as Judge Gibney said, blatantly violating a pretty core requirement in the statute. And if the court were to say that, you know, that's okay and you can get off the hook for that, it really drives a stake through a pretty important provision of this statute that can have real-world consequences. And then finally, we haven't talked about, neither side has talked about this. You're way over your time here, but I don't mean to cut you off. I'll give him some extra time. Sure. The last point is just that we would like you to. You all, you all, they've tried to get an interlocutory appeal on this thing two or three times. That's right. That's right, in this court. Back and forth a lot because they had good lawyers. I mean, it's been well lawyered. I'll say that for it. Thank you very much, Your Honor. Thank you very much. Appreciate it. Okay. Thank you, Your Honor. I would like to address this concept, this notion of informational injury, but just quickly I wanted to add about the FDIC that in addition to the letter, there is a declaration from the FDIC official, Mr. Wineland, and if you look at page 344 of the joint appendix, he explains there why he signed the letter. He signed the letter because he thought it was appropriate to list Advanta because, among other reasons, that would be the name least confusing to consumers. So it wasn't just a letter from Cardworks that happened to have the FDIC signature on it. We have his declaration saying that he signed the letter because that's what he meant, as the FDIC official incurred. What's the highlight of that affidavit as far as you're concerned? It's a four-page affidavit. Right. What's the highlight? Give me the number. Paragraph 19. Paragraph 19. That's what we want to look at. On page 344. Paragraph 19. Okay. On page 344, he explains why he signed the letter. One other quick comment on the notion that this hasn't come up because this is the first time anyone had the temerity to do this. That's just not factual. We have an expert declaration, expert report in the record from a former FTC official responsible for the FCRA. And this is it. I'm not going to point you to the whole report. Just at the very end, on page 366 of the joint appendix, he says that actually it's common for CRAs to identify the creditor as the source of the information, okay, rather than using the servicer. So this is not the first time anyone has had the temerity to do this. What about the fact, going back to the standing, that Mr. Gupta says that no court either before or after Spokio or anywhere has found your position valid? Yeah, I think it's actually quite the contrary. It's something where, you know, you take something with sparse precedent and you say there's no authority saying, there certainly is no authority saying that informational injury is automatically injury regardless of real-world consequence. And if you look at the two main cases that are relied on for this, Aikens and Public Citizen, they are, well, first I should say, before getting into those, there is a, not long ago, a D.C. Circuit opinion that directly addresses this question about informational injury. That is the Jewell case that's cited on page 10 of our reply brief. And Jewell makes clear, interpreting Aikens and Public Citizen, that you have to find first a deprivation of information, and second that that deprivation resulted in the type of harm Congress sought to prevent. Informational injury is not like a magic sort of injury that is magically free from the requirements that apply to every other sort of injury. There has to be a concrete, real or non-abstract consequence. Those are all the terms that the Supreme Court uses. And if you look at Aikens and Public Citizen, there are two main things about those cases. One is, both of those cases emphasize the reason that the plaintiffs in those cases had a need for the information, so that they were injured by not having it, because they weren't able to use it for certain purposes. Here of. Well, Mr., the plaintiff here had to file a lawsuit and expend significant resources. So, two things about that, Your Honor. First of all, we have here now a final judgment in a certified class action where there are 69,000 class members as to whom there's been no showing that they even looked at this trade law and let alone tried to contact somebody. And it's the plaintiff's burden, Spokio says that, the plaintiff's burden to show Article III standing. So, sorry, as to them, there is no showing of that sort. As to Mr. Dreher. So, it's only one person out of 69,000? Right. As to whom, their position has been it's automatically an injury for everybody else, because I won't pretend they've used the words, you know, that they've said that, well, it's what I've characterized as informational injury is a magic injury, basically, that automatically satisfied my words, not theirs. The second thing is as to Mr. Dreher itself, the notion that he had to file a lawsuit that, because it was important to him to know who he was dealing with, the FCRA says nothing about the importance of knowing who you're dealing with. The FCRA does have a statutory purpose section that talks about accuracy. That's the, there are a few other things, but that is the main focus. He gets this information from Experian with the name that they were using in dealing with consumers and an address. He writes to them on March 15th. On April 18th, he gets a letter back, which is right here in, at pages, I think, 381, of the joint appendix, which also includes a phone number to contact them. Now, he's not happy with how Cardworks dealt with his complaint once he got it, once they got it. But that is not an injury from not having the source of the information. That is an injury, if it is an injury, from having the source not deal with you the way you would like to deal with it. There are other provisions of the FCRA that deal with how CRAs and furnitures are supposed to deal with consumer complaints or corrections. That is not, though, about his not being able to contact the source. He got a letter. The letter had a phone number, and although there was reference to his security clearance, I don't think this one is in the joint appendix, but if I could find it in the record on the district court docket. I want to interrupt you and ask you something. Wouldn't it have been easier on the plaintiff had Experian listed back to the first question that Judge Thacker asked you, Advana slash Cardworks, and put a phone number? Wouldn't it have been easier on the person whose credit report Experian was messing with to have that information? I have to say yes. I have to imagine it would. I thought you would say that. So then why don't we hold you to that standard? That's the legal question you have to answer. Right. And I thought you were going to ask me the harder question, which is why we don't do it, and I don't know the answer to that. The legal question, though, is there's nothing in the statute that requires that. Maybe you'll start doing it that way. It seems like there could be some litigation avoidance benefit to it, at a minimum, Your Honor. Let me ask this question of you, just for my information. Have you ever dealt with a misreport on your credit? Yes. Not an easy thing to do, is it? No, it's not. I think that's why we have statutes like the FCRA. No, that's not right. No, I don't agree. I don't agree. I think your answer to the question is that sets a minimum, and sometimes companies, for whatever reason, they want to do the minimum. I don't know. I've never quite understood the purpose of that. If it's not that it puts pressure on the consumer to do something to make a creditor happy with them, to get that information off. It's not clear to me, and you may have minimums, but I think you've answered the question. It would have made it a lot easier had Experian done more. But there seems to be something out there that, moving in the dark universe, or the dark Internet, that I don't understand, that allows that credit moves around. People get bad things said about them. Nobody can ever quite figure out how to get it resolved. Quite frankly, I just make that point, but also to say, in the day when there is a deadly theft in credit card fraud and misuse, that is a tremendous problem. I know it's just something, but I thought you were going to say the answer was, it would be better. We just aren't mandated to do that. That might go to a business practices question, but it doesn't go to a statutory legal question. You said it better than I did, Your Honor. I thought I did, but I was just wondering. I thought you were going to get there, though, but I was keeping you over. Thank you very much, sir. We have equalized your time, and we appreciate counsel's work on this case. It has been well lawyered. Judge Thacker and I will come down and greet counsel, and we will call the next case. Judge Shedd, do you need a short break? I do not. Thank you, sir.
judges: Robert B. King, Dennis W. Shedd, Stephanie D. Thacker